Mr. Marvin, good morning. Thank you, Your Honors. I would like to reserve three minutes for rebuttal, please. This is one of many disability cases the Court has reviewed and I certainly appreciate the opportunity to present our argument. We're looking at two main prongs in our argument here. In the District Court's analysis screening summary judgment for the defendant insurer, did it apply an incorrect standard of review in applying only slightly heightened scrutiny based on the structural conflict of interest that this insurer, funder, decider has in administering disability benefits? And second, if it was the correct standard of review, did the lower court apply that standard incorrectly? In reviewing the facts on the record in this case, I only want to highlight the sequence of events where each fact read in isolation may have a rationalization which would say that this is permissible for an insurer to do this or that when the entire sequence is taken in view. It only shows a consistent pattern of behavior which is completely inconsistent with the insurer's fiduciary duty to make a fair decision on whether or not the claimant is disabled from returning to her previous occupation. Well, they have to decide. What factors would have taken this on a sliding scale to a higher level that were not factored in by the District Court? Well, to start with, what the District Court did find warranted elevation of scrutiny was the inherent conflict, the imbalance in sophistication and resources, and the reliance on object factors in terms of the medical evidence and the paper reviewing doctor's report. Are you complaining about the value that the District Court assigned to those factors or were there factors that the court did not take into account? There are additional factors that the court did not consider that should raise it to a much higher level of scrutiny. And those same factors also would warrant reversal based on the lower level of scrutiny which the District Court did apply. So you're saying under either standard the court erred? Yes, Your Honor. And of course this court applies a plenary standard of review on summary judgment. Now... Well, isn't arbitrary and capricious still a deferential standard even when it's applied in heightened form, though? Yes, that certainly is true. There is some degree of deference which is owed. But as the phrase I believe in Pinto used, I don't know if the court originated in that, whether you put a pinky or a thumb on the balancing scale is what... It's hard to articulate a real specific standard. But when we look at the sequence of facts here, it's clear that a greater degree of scrutiny is warranted than just simply saying, well, they could do this, they could do that. In and of itself, that doesn't compel finding that they were arbitrary and capricious. It's a little tricky because there's so much weighing, no pun intended, but there's balancing involved here. Now, how do we review Judge O'Neill's decision to apply a slightly heightened arbitrary and capricious standard? Well, that's a question of law based on the record, based on the specific evidence in this case of behavior that reflects bias, reflects a determination, not to make a fair determination, but a determination in terms of a set intention that they were going to cut off this lady's benefits. So what you want us to do is to say she should have used, not slightly heightened, but a very lightened? A great degree of scrutiny, not quite de novo, because that would not be proper. But as in Pinto, the actions here are on that same level where the court should take a very hard look at the insurer's declarations of good faith and not accept their explanations at face value. And indeed, in this case, if the great level of scrutiny had been applied, the court would have concluded that there was a severe conflict. And what would the judge have decided that it did not decide under the lower level? You would come out at the same place that there was no substantial evidence that showed that Ms. Work had the ability to return to her previous occupation, and the decision could not be sustained under either standard. But they based it upon Dr. Madsen's decision? He said she could do some work, but she had to move around a little bit? Well, actually, what he said, and this is only in the conversation that he had with the paper-reviewing doctor, he said she might be able to do some type of sedentary work, but only on a part-time basis. And that's a very important point, because when the paper reviewer, who wrote an 18-page report before she spoke with Dr. Mansman, because the first draft of the report says, I'm still waiting to talk to Dr. Mansman about his finding, with her conclusion that she can do full-time work on a sedentary basis because she can change her positions, when she did talk to Dr. Mansman, now the report and the inconsistency in that report was noted by Hartford's reviewer, and he asked her to clear it up. He said, look, you say you have a summary of your conversation in one point in your report, you need to fix that. And of course, she did fix that, but it shows that she drafted this report, she dictated this report, with all of her conclusions intact. She spoke with Dr. Mansman, put in an insert, which conveniently left out the fact that Dr. Mansman said, if she could work. He didn't even say that she could do sedentary work, but if she could, it would have to be a very restricted position, and she could only do it part-time. The district court took that into account, didn't it? I don't buy of its opinion. I think that the court noted that, but I don't think that the district court gave those events the proper significance in showing that there was no actual evidence of full-time capacity. And here, the policy expressly states that the ability to engage in your regular occupation for 40 hours per week is an essential duty. Did Hartford claim that Dr. Mansman did not check off on this form, that she had any time limitations? She didn't do anything on that? Is that correct or is that incorrect? There are a number of different forms that he filled out at different points, basically using Hartford's form. I'm talking about the last form that he filled out. I think he did leave some of those check boxes blank. I was struck by Dr. Mansman's observation that work had, in fact, retrogressed. In other words, she suffered the injury and she seemed to be improving, but all of a sudden, she just got worse. But I was also struck by the fact that that was not factored into Dr. Ruff's opinion or the district court's opinion. That's a very serious omission in the analysis, and that really brings up what I think is the most fundamental problem with Hartford's conduct here. When they were faced with, after the benefits had been paid for more than a year, with just the routine reports and records submitted by Dr. Mansman and other treating doctors, Hartford had no evidence of improvement in conditions. The reports said, and they indicated that there was scar tissue fibrosis that had developed in the region of the disc herniation surgery, and that this pain was disabling her. Hartford's initial adjuster who was handling the file, I believe there is some halcyon comment to the effect that while she hasn't improved, maybe we should have a medical examination done, or I should consult with our medical advisors to take a look at this. The file was transferred to Jamie Hubbard, whose first activity, and I'd like to use up some of my rebuttal time now, because I'd like to finish this up. He said, well, the first thing he did is he looked at the file and said, I don't see the medical records that we had requested in October, so I'm going to terminate your benefits if you don't supply these. Well, she already had, in fact, supplied them, and the record reflects how much distress that caused her. And a supervisor said, yeah, the records are in here. So then what Mr. Hubbard did is he did a walk-up with clinical. That's all the documentation. She's not disabled. There's no evidence of improvement. There's no medical opinions. There's no evaluation. They don't really take into account anywhere that I can see the heart-rending letters that Mrs. Work wrote to them explaining why she was so disabled and how much she would love to get back to work. None of that is given any weight that we can see from Hartford. On appeal, only then does Hartford develop any kind of medical evidence to deal with this. But before looking at the medical facts, what Hartford's appellate reviewer does is he opens up, sua sponte, a pre-existing condition defense. And only when that falls short, only then does he order this review by Dr. Rofe. And my brief details how this is a pilot program that this company wants to do for the Hartford to show them that they can help them review disability files. He routinely reviewed those though, didn't he? The pre-existing. That was just the way he went at it. Always. Didn't he say that? Well, he said he likes to look at all the issues. He says to do a full and fair review, he wants to look at all the issues in the case. But why didn't he go back to Dr. Mansman and ask him if checkboxes were missing? You know, what's your opinion about the duration? Why didn't he conduct an interview or surveillance or order a medical examination? Which he said a medical exam was something that they could do if there were differences of medical opinion. But in his career as an appellate reviewer, he said he'd ordered an IME maybe five or six times. So again, with all of those factors, the higher standard of scrutiny and a reversal is warranted in this case. The observation of Dr. Mansman that she had gotten worse, was that supported by objective medical evidence? By the MRIs which were taken that showed the existence of the scar tissue, yes. And he explained to Dr. Rope that he didn't order EMGs unless he was actually going to go in and do further surgery. And with this kind of condition, further surgery can just make things worse. What is your request on appeal? That the order be reversed with directions to grant summary judgment in favor of the plaintiff. Thank you. Mr. Ploof? May I pronounce that correctly? Ploof. Yes. Good morning, Your Honor. My name is Ken Ploof and I represent the Hartford. The thrust of the plaintiff's argument seems to be that Hartford should have done this, that, and another thing in order to disprove her claim, rather than that fundamentally the burden rests with her to establish continuing disability. And we seem to be dancing around that issue, but it was on her to show continuing disability. Of course, she originally had a grant of disability by the company, by Hartford, right? Correct. And so is it up to her to show that she continues to do it or up to Hartford does she find that she's not in such a position? I'm sorry. It is up to her to show continuing disability, to continue to submit proof satisfactory to Hartford that her disability is ongoing. But what had changed in her situation? What caused her to go from disabled to not disabled? Well, that's an interesting question and I think that's the key to this case in many respects. Dr. Mansman initially suggested she would be disabled for all of three months. During that three-month period, physically she seemed to be showing some improvement. If you look at the forms that he completed, he indicated that physically she could do more and more. At about the three-month mark, he says it looks like it's going to be a couple more months. We now get to a projected disability of, I believe, it's five to six months. Again, he's completing the forms which indicate, if you look at them objectively, that she can do this, that or another thing, that she is indeed improving. She reports to him, and I forget the date, forgive me, that she is 45% improved at one point. He continues to submit forms and you'll recall that at about the six-month mark or so, the forms that he is submitting sometimes address issues of functionality, sometimes don't address issues of functionality, are often incomplete. There comes a point, however, when she, according to him, regressed. But there's never any factual or medical evidence to explain what happened. Why is it that he starts off with a three-month projection, goes to about a five-month projection, indicates on his form that she can engage in this and that activity, and then she's regressed, but there's no explanation. It's not out of the realm of medical possibility, is it, that somebody who is improving, especially with a back injury, suddenly regresses or setback? Oh, I don't think so, not at all. But I think there has to be an explanation as to why. No, but he based his decision, if I'm not mistaken, on an MRI. Based on the MRI and his consultation with his client, he determined that she was regressing. I don't believe he based it on an MRI at all. If you look at the MRI, the MRI really shows a very small concentric bulge. It's not a significant MRI at all. I can't, I mean, that's a medical opinion. He took an MRI and he said it showed disc degeneration and that she had regressed. I understand that, but he's not tying the two things together. She came in with a bad disc. What's different now than before? He doesn't tie that together at all. You also have to remember that there's two other doctors involved here. Dr. Kraus, who she sees at Bryn Mawr Rehabilitation Hospital, has a consult with him. He makes certain suggestions and she never follows through on those. She sees Dr. Albert at the Rothman Center for a consult. Never submits anything from him, and he is a back specialist, anything from him explaining what her problem happened to be. Did Manson ever say that she can do anything more than part-time sedentary work? I don't believe so. I believe to the extent he addressed work, physically doing things, he said part-time sedentary. Then what's the basis of saying that she is not disabled? Just because she doesn't carry her burden of proof? It's essentially that if you look at the job description that the employer provided and you look at what Dr. Manson had to say as to what she could do during the course of the day, remember he checks the boxes where he says, and I'm just picking one off the top of my head, she can sit for 50% of the day or three hours or whatever, she can stand for two hours, she can do this, that, another thing. If you take those restrictions or limitations and you look at what her job description was, she could clearly do the job. On the record, you credited Dr. Manson's opinion about not lifting more than 10 pounds and the need to change positions, but you did not credit the part-time sedentary limitations. So why don't you kind of select it there? I don't think so. I think one is entitled to look at it and step back and then ask another physician, in this case, Dr. Roth, can you reconcile what we have here? And I think she did that as the trial judge quite clearly recognized that she did a thorough review. And although she must obviously take into consideration what a treating doctor such as Dr. Manson says, she does not have to accept the opinions that he gives. Otherwise, there would never be any evaluation by any disability carrier because the plaintiff could simply send in reports with opinions and you wouldn't be entitled to look at it through the eyes of your own doctor. Dr. Manson, who was the treating physician and has seen her on a number of occasions, told Dr. Roth, did he not, that all she can do is part-time sedentary work? I believe he did. I believe when they spoke, I'm trying to remember if he said that initially in a report. I think you're correct that when she spoke to him and she was preparing her report, she quotes him as saying that. The only person then who concluded that work can do full-time work even with limitations was Dr. Roth. Correct. You have Dr. Manson saying part-time sedentary but indicating that she could perform the physical functions of her job. And you have Dr. Roth who's saying that she looks at it and she concludes differently. She's based it strictly on his report, so right. Well, no, more than that. She had the reports of Dr. Manson. She had the historical reports preceding her supposed onset of the back injury. She had the report of Dr. Krauss as well. She had asked... What Dr. Krauss say that she should have some sort of rehabilitative... Correct. He's a rehabilitation specialist. He had suggested that rehabilitative services would be helpful to her and that he was willing to consult with her on that and that she should call him and make an appointment and come back. And she never did. And I believe he said he contacted her twice and she just never bothered to come back. He had no explanation as to the why. He didn't offer any. The bottom line in this type of case is Senator Johnson versus Hartford. One can look at these often and come to the conclusion that something else could have been done. A different conclusion could have been reached. But that's not the issue. The issue is, does the evidence compel a different conclusion should a different conclusion have been reached? We can argue about many of the details in these type of cases. But if discretion, wherever you put it on the scale, is to be afforded the disability carrier, it has to have some meaning. Unless we decide that the district court didn't use the appropriate standard that there should have been more of a heightened scrutiny, can we handle that analysis on our own or do we have to send it back to the district court? I'm sorry, I only caught part of that sentence. I can understand the problem. Suppose we decide that the standard of review should have been in a more heightened form. It's still arbitrary and capricious, but it should have been more heightened. Can we do the analysis based upon that standard or do we have to send it back to the district court? I believe if it revolves around a factual issue, that is that perhaps the district court should have taken greater consideration, should look further into this fact or another fact or a third fact, and with an eye towards evaluating it to the standard applied, then I think it's up to the district court to go back, take another look at it and say, well, maybe a higher standard is necessary. I think if it's a fact that's clearly not in dispute among the parties and that was accepted by the district court, then this court can say, given that fact which no one is disputing, we think a higher standard is appropriate. And I do think I recall the initial thrust of your question. I frankly think the district court was rather generous to the plaintiff here with regard to the standard because with regard to the sophistication issue, obviously Hartford is fairly sophisticated, but once someone like Mrs. Work gets counsel involved and she had counsel involved very early, they're on an even playing field. And so sliding it on that basis, granted the court thought that appropriate, I don't know that that's merited once someone has counsel involved. It's a good point, but on the other side of the ledger is the claims examiner was changed and as soon as a new claims examiner came in, her claim was rejected. I mean, you don't dispute that fact. And then of course the claim, she appealed and the rejection was firmed. It was, Ms. Coleman had it initially, then Mr. Hibbard took over and I don't think there's anything in the record and I frankly can't recall as to why Mr. Hibbard became involved. I believe it was a transfer issue, but I'm not sure that that's on the record. I think it was simply, she was transferred to another area. So it had to go to somebody else. Unless she was receiving benefits, a new examiner came in and rejected the claim. But I think that's a factor that goes into play and whether the scrutiny should be heightened further or not. If there's something in the record that shows that there's real reason to question that, that is, is there anything in the record, I don't think there's a single thing, that shows that Hartford went from Coleman to Hibbard with intent or purpose or suggestion of using that as a pretext for denying her claim. But I think there has to be something to work from. We just can't infer that simply because one person replaced another person that there's something nefarious behind it. Those sorts of things happen all the time. There must be facts in support of the inference, not just the inference sleeping at us. How do you feel the other Pinto factors come down in this case? I think the district court properly applied the Pinto factors. There's really no other element of the elements laid out in Pinto that justify a heightening of scrutiny in this case. There aren't. Not under the Pinto factors and not under the, if you go to the second level, procedural irregularities, bias, anomalies, that sort of thing. There really are none. There's allegations of that. But again, there's no facts in support of it. Yet there's a comparable factor, which is that the insurance company's profits are directly, of course, affected by the payouts or the claims that it accepts or rejects. Certainly. But again, as this court has recognized many times, there must be facts that suggest that that played a role. I mean, we can assume that this is a profit-making entity, but we can also assume that, and I agree the trial judge did this, that unless you have something in the evidence, in the record showing that that played a role, you just can't say that, oh, that must have played a role. That's something we have to in every case like this. But isn't that a factor that Pinto said could certainly be taken into account? I believe Pinto said we need evidence of that. And again, unless there's evidence of that, one can assume there's a robust company that this claim is no different than any other claim. Otherwise, frankly, it would always be a factor. There'd be no point in saying it's one of the things to consider. It would be presumed in every case, and it should be presumed in every case. But if it's going to be presumed, it should be done explicitly and just start off with this is an insurance company, and frankly, they're profit-making, and we're going to presume that they are operating with a conflict of interest that would impel them to always be in a position, contrary to the person in the conflict position. Well, that's why there's somewhat of a heightened scrutiny anyway, right? In that sort of case, it doesn't always happen. Correct. I think implicitly or explicitly, there always is. Whether it's recognized as a fact or whether it's just recognized as a implicit fact of life, I think it's there all the time. Unless there are other questions? Judge Vander Turpin? I do not have anything further. Thank you. Mr. Proof, thank you very much. Thank you. Mr. Marvin? Your Honor, I did use up all my time on direct. I would like to submit two unpublished opinions. Just give them to the clerk, please. Thank you. Thank you, Mr. Marvin. Mr. Proof, thank you very much. Very well presented arguments. We will take the case under advisement. Thank you.